## Richmond

### COOK v. COMMONWEALTH.

March 20, 1913.

1. CRIMINAL LAW — *Grand Jurors* — *Eligibility* — *County Supervisor*— *"Overseer of Road."*—A supervisor of a county who, under certain circumstances, has supervision and control over the roads in his district, is not an "overseer of a road" within the meaning of the section 3977 of the Code so as to render him incompetent to serve as a grand juror.

2. CRIMINAL LAW—*Grand Juror*—*"Overseer of a Road"*—*Code, Sec. 3977.*—Under the existing system of our laws providing for the construction and keeping in repair of the public roads and bridges within the several counties of the State, there was, when the indictment in this case was found, no such office as "overseer of road" and hence section 3977 of the Code could not be construed as applicable to the office of supervisor, of which no mention is made in the statute.

3. CRIMINAL LAW—*Murder*—*Verdict Not Sustained by the Evidence.* The evidence in the case at bar does not sustain the verdict of murder of the first degree found by the jury.

Error to a judgment of the Circuit Court of York county.

*Reversed.*

The opinion states the case.

*Frank Armistead* and *T. H. Geddy,* for the plaintiff in error.

*Richard B. Davis, Assistant Attorney General,* for the Commonwealth.

CARDWELL, J., delivered the opinion of the court.

Hezekiah Cook was indicted in the Circuit Court of York county for the murder of Thomas Bartlett, was found guilty of murder in the first degree, and sentenced to be electrocuted. To this judgment of the circuit court a writ of error was awarded the prisoner.

The first error assigned presents the question whether or not D. R. Norment, a member of the grand jury that found the indictment against the prisoner, was ineligible to serve as a grand juror by reason of his being at that time also a member of the board of supervisors of York county, and as such had, *ex officio*, supervision and control over the roads in Bruton district in York county, and was charged with certain duties in respect thereto, which duties, however, do not devolve upon the supervisor except when no superintendent of roads of the district has been appointed or that office becomes vacant. Acts 1908, page 408.

The statute, now section 3977, Code of 1904, defining the qualifications of grand jurors, does provide that an "overseer of a road" shall not be eligible to serve on a grand jury, but under the existing system of laws providing for the construction and keeping in repair of the public roads and bridges within the several counties in the State, there was, when the indictment in this case was found, no such office as "overseer of a road," and, therefore, section 3977 of the Code, *supra,* could not be construed as applicable to the office of supervisor, of which no mention is made in the statute. Whatever reason there may be for the disqualification of a member of the board of supervisors of the several counties to serve as a member of a grand jury, the General Assembly has not seen fit to provide by statute the disqualification.

The second assignment of error, making the contention that the law was not complied with in issuing the *venire facias,* and the fourth, relating to the refusal of a new

trial to the prisoner "on account of after-discovered evidence," presents questions not likely to arise at another trial of the case, and as the judgment of the trial court has to be reversed on another ground and a new trial ordered, it is unnecessary to consider these questions.

The third and remaining assignment of error is to the ruling of the trial court refusing to set aside the verdict of the jury because contrary to the law and the evidence.

It appears that the killing of the deceased by the prisoner occurred about 12 o'clock Friday night, July 13, 1912, and the only two persons present, who have testified in this cause, were the prisoner and one Maude Page; and no one testifying for the Commonwealth knew anything about the occurrence, except what the prisoner, or Maude Page, told them just after it happened, and no one of them contradicted, to any extent whatever, either the prisoner or Maude Page. On the contrary, said witnesses say that what was told by the prisoner and Maude Page a few hours after the blow was struck the deceased is exactly the same as told by them on the witness stand at the trial of the prisoner.

The theory of the Commonwealth is that the killing was caused by jealousy, and that the accused followed the deceased from Williamsburg to Maude Page's house and there killed him, but the evidence wholly fails to sustain that theory. An attempt was also made to show that improper relations existed between Maude Page and the prisoner, but that attempt likewise failed, and, in fact, it will be seen when we come to review the evidence that there is none as to the motive for the killing of the deceased other than the explanation made by the prisoner and the only other eye-witness to the occurrence.

The trial court certifies the following as the statement made by Maude Page, as witness for the prisoner:

"That she lived in York county, about two and one-half miles from Williamsburg. That on the night Bartlett was

killed she went to church with Olivia Williams and her husband, Chris. Williams. That she left her child at Chris. Williams' house. That they went in church together and sat on the same bench. That after the exercises were over she met Bartlett and he walked home with her. That they stopped at Chris. Williams' house and she got her child and put it in a wagon and pulled her home; that as soon as she got home she lit a lamp and the child went up stairs to bed; she stayed on the porch with Tom. That Tom asked her an improper question and tried to take advantage of her, and put his hand on her head and pushed her back into a chair that was on the porch against the side of the house, and put his other hand up her clothes; that she hollowed 'stop, stop, stop!' loud enough to try to get help, and she fought him with her hands. While they were clinched, and Bartlett was leaning over her and pushing her against the back of the chair, some (one) came up behind Tom and struck Tom; that as soon as Tom was struck she ran in the house and came out again pretty soon, and Cook was there. Tom was lying on the porch groaning, and Cook asked her to get some water; that she went into the house and got a basin of water and cloth; that Cook washed Tom's head and tied it up with the cloth. After bathing Tom's head and laying him in the porch with his feet on the ground, Cook went to his sister's to tell them about it. Cook and his sister, Matilda Williams, came back together and in a little while Elias Williams, her husband, came. That she stayed in the house and did not talk to Elias Williams, because he soon went to tell Tom's father. That she did not know the time of night it was, but they had walked from Williamsburg after church, and that she thought it was between 11.30 and 12 when church closed. That no improper relations existed between her and Cook, and that Cook was not the father of her child. That Cook was not her regular company, but that they were thrown together a good deal on account

of their church and Sunday-school work, and that she had another man with whom she kept regular company. That she was the mother of only one child, nine years old. That no blood spattered over her when Tom was struck, and none got on her clothes."

Olivia Williams corroborated the statements of Maude Page as to what occurred prior to the latter's leaving witness' home to go to her own home that night.

The testimony given by the prisoner, as certified by the trial judge, is as follows: "That he left his home, about five miles from Williamsburg, for Williamsburg, about 6 o'clock on the afternoon of the night that he killed Tom Bartlett. That he was a member of a church committee and had some papers to deliver to the Rev. Dawson. That a Sunday-school convention had been held in session all the week in one of the churches in Williamsburg, they holding two sessions a day, one in the morning and one in the afternoon. That he had attended all of the night meetings and expected to attend the meeting that night, and went in town early so he could attend to the other business before the meeting began. That he got to Williamsburg and delivered the papers; he found that he had lost some money—about twenty dollars. That he went back home to see if he had left it at home, and on his way home met his half-sister, Matilda Williams, and told her about losing his money; afterwards met Zack Staves, but did not tell him about losing his money as he did not think it well to talk too much about it until he had tried to find his money. That he went home, searched all through the house, yard, garden and blacksmith shop, and hunted some in the woods near the house where he had been in the afternoon. He could not find the money, and he then remembered that he had stopped on the side of the road to answer a call of nature, and decided to go and look and see if he had lost it there. That he took a lantern and walked slowly, looking to see if he had dropped it in the road or path. That the

path that he had followed when going to town, which was the one that he usually used, led by the house of Maude Page and within a few feet of her porch. That just before he reached Maude's house he heard some talking or noise that sounded as if some one was in distress. That he stopped a minute and lowered his lantern, and just as he did he heard a loud cry of 'help, help!' He did not remember the exact words that he heard, but knew that it was a woman's voice and that she was in distress. He had a stick in his hands that he had picked up in crossing a swamp about three-quarters of a mile from Maude's house. That when he heard this loud and distressing cry that he immediately ran to the porch of Maude Page's house and saw Maude and a man clinched. That Maude was back against the house and the man next to him; that he jumped into the porch, which had no railing around it, and struck the man with the stick, intending to weaken him so that he could hold him until he could get help. That as soon as he struck the man he grabbed him around the body and found he was limp. He laid him down on the porch and saw that it was Tom Bartlett, his half-brother. At the time he struck him he had no idea who it was. He then called Maude, who had ran into the house as soon as she got loose from Tom, and asked her to bring him some water and rags. That she brought him a basin of water and a cloth; that he bathed Tom's head and tied it up with the cloth. That he then laid him on the porch with his feet on the ground and went to the house of Elias and Matilda Williams and told them what had happened. That Tom was not dead when he left him, but he knew that he was hurt seriously. That Matilda Williams and himself walked back to Maude's house and Elias Williams drove around the road. When he got back he found that Tom was dead. He was so worried and excited he did not know what to do, and Elias Williams went after Tom's father and he staid with the body. That shortly after Elias left he laid Tom

out in the yard so that his body would be straight when it was cold, and covered it up with something that he had put around him when he left to notify Elias Williams. That Elias returned and Tom's father and brother came with him, and one of them went to notify Mr. W. B. Schenck, the nearest justice of the peace. That he stayed there until the justice came and was present at the inquest and told how it had happened. That after the inquest Mr. Schenck put him under a $300 bond to appear at court; that W. L. Schenck went on his bond and that he surrendered himself in court on the first day of the term. That he had known Maude Page all of her life, and had visited frequently at her house, both while her mother was living there and since her death. That he had always been friendly with Maude's family and for the last two or three years he had been thrown with Maude a good deal in church work. That he took an active interest in church work and was superintendent of a Sunday-school, of which Maude was secretary, a teacher, etc. He denied that he had ever been in love with Maude, or that any improper relations existed between them. That he and his half-brother were on good terms, and that there had never been any trouble between them."

The only contradiction of the statement made by the prisoner to be found in the evidence for the Commonwealth, which is at all material, is that given by the witness, Benj. Dishaman, who said that he saw the prisoner at the church Friday night (the night deceased was killed), and talked with him on the church steps. The prisoner was recalled to the witness stand and made the statement that Dishaman was mistaken about seeing him at church in Williamsburg Friday night, but that he had seen Dishaman and talked with him on Thursday night, and Dishaman had gotten mixed as to the night he saw him and had the talk. Dishaman was not recalled to contradict this statement of the prisoner.

The evidence shows that the stick with which the prisoner was struck was just such a stick as he usually used, picked up along any route that he might be walking, and would vary at times "from a lathe to a good size pole." The deceased was struck but one blow, according to all the witnesses; and the foreman of the coroner's jury, testifying for the Commonwealth, says that while he did not examine it closely, "it did not look like his skull was as thick as a negro's skull ought to be." Witnesses, both for the Commonwealth and the prisoner, who spoke on the subject say that the relations existing between the prisoner and the deceased (his half-brother) had always been cordial and friendly, and no one ever heard anything to the contrary; and all of the witnesses, both for the Commonwealth as well as for the accused, and who are his neighbors, testify as to his good character and repute as a law-abiding and peaceful citizen, one or more of them saying that his reputation for honesty and good citizenship was as good as any man's in the community, white or black; and one (witness for the Commonwealth) saying that he would not have believed the prisoner had killed Bartlett if he had not admitted it.

We have not only the absence from the record of all proof as to an express declaration tending to prove a motive in the killing of the deceased, but there is no evidence tending to prove a circumstance from which a motive for the killing, other than what is shown in the statement of the prisoner and Maude Page, might be inferred.

We are of opinion that the evidence appearing in the record plainly does not support the verdict of the jury, and, therefore, the judgment of the circuit court thereon is reversed, the verdict of the jury set aside and the cause remanded for a new trial to be had in accordance with the views expressed in this opinion.

*Reversed.*